******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be pub-lished in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing post opinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

STATE OF CONNECTICUT *v.* QINXUAN PAN
(SC 210039)

The petition of the defendant, Qinxuan Pan, filed August 9, 2021, for review of the trial court's denial of his motion for modification of bond, having been presented to the court, it is hereby ordered granted, the relief requested is granted in part, and the case is remanded with direction to consider the defendant's request for a 10 percent bail option pursuant to Practice Book § 38-8.

November 22, 2022

PER CURIAM. The defendant, Qinxuan Pan, seeks review[1] of the trial court's denial of his motion for modification of the $20 million bond that was set in connection with murder charges against him. The defendant claims that the trial court, *Harmon, J.,*

with murder in violation of General Statutes § 53a-54a, arising from the shooting of the victim, Kevin Jiang, in New Haven on February 6, 2021. In signing the warrant for the defendant's arrest on February 26, 2021, Judge Harmon set the defendant's bail at $5 million cash or surety. Following a nationwide manhunt that took several months and involved multiple federal and state law enforcement agencies, the defendant was arrested in Montgomery, Alabama, on May 13, 2021, and waived extradition to Connecticut. The defendant was arraigned before Judge Fischer in Connecticut on May 20, 2021.

At arraignment, the bail commissioner recommended that Judge Fischer keep the defendant's bond at the $5 million set when Judge Harmon signed the warrant, arguing that the defendant is a Massachusetts resident with no ties to Connecticut who presents "a serious flight risk" insofar as he had fled the state and is "struggl[ing] with mental health issues." The prosecutor, however, asked Judge Fischer to increase the defendant's bond to $50 million, contending that "he is an extreme danger to the community and a major flight risk" given the violent nature of the shooting and the three month manhunt it took to locate him in Montgomery, Alabama, where he had rented an apartment under a false name and was in possession of approximately $19,000 in cash, along with seven cell phones, a computer, and his father's passport. The prosecutor represented to Judge Fischer that the defendant's family has "very substantial financial assets, going well into the millions of dollars," including the ownership of two houses in Massachusetts, and that the defendant, although a United States citizen, "has ties to people in multiple states" and "was born in and has ties to Shanghai, China."

In response, defense counsel requested the imposition of "a reasonable bond" of $2 or $3 million, along with electronic monitoring, acknowledging the defendant's "flight pattern" but relying on his waiver of extradition, lack of a criminal record, and academic achievement, as well as his parents' willingness to post their house for bond. The defendant argued that the ownership of two houses in Massachusetts "hardly makes [the defendant's parents] billionaires." After considering the arguments, Judge Fischer increased the defendant's bond to $20 million, stating that he "is extremely trou-

bled by the efforts th[e] defendant has made to avoid apprehension and potentially flee th[e] country . . . ."[5] Judge Fischer then ordered the case transferred to the part A docket for the judicial district of New Haven.

The defendant subsequently initiated steps to obtain modification and appellate review of the $20 million bond set at arraignment by Judge Fischer. First, on June 1, 2021, the defendant filed his first petition for appellate review of the $20 million bond set by Judge Fischer.[6] Second, on July 8, 2021, the defendant filed a motion in the trial court seeking modification of the bond. See Practice Book § 38-14.[7]

On June 29, 2021, we granted the defendant's first petition for review and ordered Judge Fischer either (1) to "articulate the facts . . . and the factors . . . considered in setting bond for the defendant" at $20 million pursuant to General Statutes (Supp. 2022) § 54-64a (b), as amended by Public Acts 2022, No. 22-37, § 38 (P.A. 22-37),[8] or (2) to "hold a hearing to establish such facts and [to] apply such statutory factors." On July 12, 2021, Judge Fischer issued an articulation in response to our order.[9] Subsequently, on July 20, 2021, we denied the relief requested in the defendant's first motion to review "without prejudice to refiling after the hearing regarding the [July 8] motion for modification of bond . . . . [We] further ordered, sua sponte, that the judge who presides over the motion for modification of bond . . . state on the record or in a memorandum of decision the factors considered under Practice Book § 38-4 (c)[10] and the correlation between the reasonableness of the amount of the bond set to ensure that the defendant will appear in court and not threaten the safety of himself or another person." (Footnote added.)

Subsequently, on July 28, 2021, Judge Harmon held a hearing on the July 8 motion for modification of the defendant's bond. See Practice Book § 38-17.[11] At that hearing, defense counsel first renewed his reliance on the bail commissioner's initial $5 million recommendation, contending that it was consistent with the bond amount imposed when the warrant was signed by Judge Harmon, who was "aware" that the defendant had already "been on the run for three weeks" and of the "serious" allegations described in the warrant. Addressing the strength of the state's case, defense counsel also

argued that there were 911 telephone calls at the time of the shooting indicating that a black male was the shooter and that there were two people in the sport utility vehicle from which the shots were fired, putting it "in the realm of possibility that [the defendant] hypothetically was present but not the shooter." With respect to his risk of flight, counsel relied on the defendant's cooperative demeanor when he interacted with North Haven police officers on the night of the shooting and when he was apprehended in Alabama three months later, which, counsel argued, along with his waiver of extradition, "are indicia of his intent to come back" to Connecticut. Defense counsel also contended that there is no evidence that the defendant has any connections to China, insofar as his parents renounced their Chinese citizenship and had not had contact with people in that country for the last five years. Counsel argued that the extent of the defendant's family wealth has been overstated, that the defendant personally is indigent, and that his personal income prior to his arrest was his graduate student stipend of approximately $30,000 annually, with no assets. Relying on his lack of a criminal record prior to this case, the defendant offered to remain in Connecticut and to submit to electronic monitoring upon the issuance of a "reasonable and not excessive" bond, as constitutionally required under this court's decisions, including *State* v. *Menillo*, 159 Conn. 264, 269, 268 A.2d 667 (1970).

The prosecutor objected to the defendant's request for a bond reduction. The prosecutor reviewed the statutory factors of § 54-64a (b) (1) and (2) that are recited in Practice Book § 38-4 (c) and (d), respectively, and argued that the defendant presented a significant flight risk and a danger to the community and himself. The prosecutor represented that, contrary to the defense's arguments, the defendant's family had contact with China as recently as 2020. The prosecutor emphasized the role of the defendant's family, in particular his parents, in facilitating his flight from Connecticut—noting that license plate readers, surveillance videos, and a lost cell phone confirmed their presence with the defendant at various locations in New York, North Carolina, and Georgia during his flight from Connecticut. The prose-

cutor represented to Judge Harmon that law enforcement officials had "informed the [prosecutor] that the defendant and his family had substantial financial assets, well into the millions of dollars," observing that large wire transfers from China to them had "been flagged numerous times for suspicious activity" by the United States Department of the Treasury. The prosecutor also relied on the defendant's mental health issues, his Massachusetts residency with "absolutely no ties" to Connecticut, and the fact that he "still has family in China . . . and is engaging in financial transactions originating from that country." The prosecutor then described the significant evidence linking the defendant to the victim's murder, including DNA evidence linking the victim to a hat that the defendant had been wearing when stopped by police after the homicide, his attempts to create a false trail to elude the police after the homicide, and his theft of a GMC Terrain from a dealership in Massachusetts, which he used to create the impression of other drive-by shooting attempts from that vehicle on the same day as the homicide. Finally, the prosecutor argued that the defendant was an extreme flight risk, as shown by the three month, multiagency manhunt it took to track him to Montgomery, Alabama, where he was found renting an apartment under a false name and in possession of more than $19,000 in cash, multiple cell phones and subscriber identity module (SIM) cards, "and most importantly, his father's . . . passport."[12] Ultimately, the prosecutor relied on this evidence to contend that the bond should remain set at $20 million because the "defendant is an extreme flight risk . . . a danger to the community . . . [and] a danger to himself, and [the prosecutor could] not see how, based on [the defendant's] past actions of fleeing and avoiding law enforcement for a very long time . . . he can be guaranteed to come back to court."[13]

Judge Harmon considered the various statutory factors and agreed with the prosecutor's argument that the $20 million bond set by Judge Fischer was "appropriate . . . ."[14] In so concluding, Judge Harmon emphasized the "acute" flight risk presented by the defendant, who had active family assistance when he fled to Alabama, the strength of the evidence and seriousness of the

offense, his lack of ties to Connecticut, his mental health issues—including statements of suicidal ideation—and his financial resources—including having approximately $19,000 on his person when arrested after a three month flight, despite being unemployed.

Defense counsel then asked Judge Harmon if he "[w]ould . . . consider a 10 percent cash alternative to whatever bond is ultimately imposed . . . ." Judge Harmon, however, concluded that, under the rules of practice, a 10 percent cash alternative would not be "applicable" or "an option" in this case because Practice Book § 38-8 imposes "a limitation on the bond itself," namely, "a top level not exceeding $20,000 . . . ." This bond review petition followed.

## I
## WHETHER JUDGE HARMON ABUSED HIS DISCRETION IN DENYING THE MOTION TO MODIFY THE DEFENDANT'S BOND

In his petition for review, the defendant reiterates his factual arguments and amenability to house arrest and electronic monitoring in Connecticut and contends that the $20 million bond was an abuse of the trial court's discretion because "it is a random amount" that is "tantamount to . . . no bail at all," in violation of his right to reasonable bail under article first, § 8, of the Connecticut constitution and the eighth amendment to the United States constitution. See, e.g., *State* v. *Menillo*, supra, 159 Conn. 269. He argues that the articulations of decision issued by Judge Fischer, and stated on the record by Judge Harmon, "failed to state how the bond amount correlates with the purposes of bail stated in Practice Book § 38-4 (c)," namely, to ensure his appearance in court.[15] Finally, at oral argument before this court, the defendant's appellate counsel contended that Judge Harmon improperly denied his request for a 10 percent cash option on the ground that Practice Book § 38-8 did not afford him the discretion to impose a 10 percent cash bond.[16]

In response, the state does not challenge the defendant's argument that Judge Harmon incorrectly concluded that he lacked discretion to impose a 10 percent cash option. Instead, the state relies on our decision in

*State* v. *Anderson*, 319 Conn. 288, 308, 127 A.3d 100 (2015), to contend that a "reasonable" bail amount is not necessarily one that the defendant can afford. The state then argues that the $20 million bond amount was reasonable and consistent with the statutory factors set forth in § 54-64a (b) and Practice Book § 38-4, given the "violent, ambush style murder" at issue, the defendant's act of endangering the public by leaving different handguns and ammunition at other locations in New Haven and Hamden in an effort to confuse the police, and the risk of flight presented by the defendant's foreign ties, access to significant financial resources and the assistance of his parents in eluding capture. We conclude that Judge Harmon did not abuse his discretion in maintaining the defendant's bond at the $20 million set by Judge Fischer but that remand is required because Judge Harmon incorrectly determined that he lacked discretion under Practice Book § 38-8 to consider the defendant's request for a 10 percent cash bail option.

"Typically, [t]he determination of an appropriate pretrial bond is a matter within the sound discretion of the trial court . . . and appellate review of an order setting such a bond is limited to consideration of whether the trial court abused its discretion." (Citation omitted; internal quotation marks omitted.) *State* v. *Anderson*, supra, 319 Conn. 300; see, e.g., *State* v. *McDowell*, 241 Conn. 413, 415, 696 A.2d 977 (1997). "To the extent the defendant's claim requires us to construe either the meaning or applicability of constitutional or statutory provisions, however, our review is plenary." *State* v. *Anderson*, supra, 300. This plenary review extends to our construction of the applicable rules of practice and is "governed by the same principles as those regulating statutory interpretation," namely, the plain meaning rule. (Internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, 328 Conn. 586, 594, 181 A.3d 550 (2018); see, e.g., *Gilchrist* v. *Commissioner of Correction*, 334 Conn. 548, 553, 223 A.3d 368 (2020). "[W]e construe rules of practice in light of the statutory policy that they implement." (Internal quotation marks omitted.) *Meadowbrook Center, Inc.* v. *Buchman*, supra, 603.

## A
### Whether the $20 Million Bond Was an Abuse of the Trial Court's Discretion in Light of Connecticut Constitutional Principles

Certain background principles of law under our state constitution inform our determination of whether Judge Harmon abused his discretion in denying the defendant's motion to modify the $20 million bond set by Judge Fischer. Article first, § 8, of the Connecticut constitution governs bail in Connecticut. It provides in relevant part: "In all Criminal prosecutions, the accused shall have a right . . . to be released on bail upon sufficient security, except in capital offenses, where the proof is evident or the presumption great . . . ."[17] Conn. Const., art. I, § 8. It is well established that, under our state constitution, "[t]he fundamental purpose of bail is to ensure the presence of an accused throughout all proceedings, including final judgment. If an accused were kept locked up in jail from the time of his arrest, there would be no question as to his availability at all times. *But the bail provision of § 8 of article first of our constitution makes clear that it was intended that in all cases, even capital cases not falling within the exception, bail in a reasonable amount should be ordered.* This is reinforced by a further provision in the same section of our constitution prohibiting a requirement of 'excessive bail,' which thus prevents a court from fixing bail in an unreasonably high amount so as to accomplish indirectly what it could not accomplish directly, that is, denying the right to bail. *But a reasonable amount is not necessarily an amount within the power of an accused to raise. It is an amount* [*that*] *is reasonable under all the circumstances relevant to the likelihood that the accused will flee the jurisdiction or otherwise avoid being present for trial.*"[18] (Emphasis added.) *State* v. *Menillo*, supra, 159 Conn. 269.

More recently, in *State* v. *Anderson*, supra, 319 Conn. 288, we considered whether our constitutional requirement of "reasonable bail" in noncapital cases permits a trial court to impose a bail amount that functionally operates as a denial of bail. In *Anderson*, the trial court imposed a $100,000 bond on an indigent insanity acquittee, Francis Anderson, who had been charged with repeatedly assaulting staff and other patients at the Whiting Forensic Division of Connecticut Valley Hospital (Whiting), where he had been confined; the trial court had imposed that bond to protect other patients and staff at Whiting by incarcerating Anderson.

See id., 292–97. On appeal to this court, Anderson claimed that "the trial court's imposition of a monetary bond as a condition of his release violated his right to bail as guaranteed by article first, § 8, of the constitution of Connecticut" because it "amounted to impermissible preventive detention." Id., 299. Specifically, he contended that "the fundamental purpose of bail is to ensure the subsequent appearance of the accused and not to protect the public from a dangerous accused," and that, "because, as a confined insanity acquittee, his appearance in court essentially was [en]sured, the court's setting of a monetary bond was not permissible." Id.

In rejecting these claims, we observed that, "[t]o begin, [*Anderson*] *was not actually denied bail* but, rather, was unable to post the bail that the trial court, in its discretion, properly set. Accordingly, as in [*State v. Ayala*, 222 Conn. 331, 350–51, 610 A.2d 1162 (1992)], [Anderson] was afforded the opportunity for release that constitutionally was required." (Emphasis added.) *State* v. *Anderson*, supra, 319 Conn. 307. In a footnote, we further rejected Anderson's reliance on preventive detention cases in which defendants had been completely denied bail to protect public safety, stating that, "[*b*]*ecause the trial court set a bond*, much of the authority on which [Anderson] relies, which involves state constitutional provisions similar to Connecticut's, is readily distinguishable or otherwise does not support his claim." (Emphasis added.) Id., 307 n.31; see id., 308 n.32 (emphasizing that bond of $100,000 did not constitute preventive detention, which "is permitted in certain instances in the federal system" but "not permitted under our state constitution except in capital cases"). Observing that both ensuring the appearance of the accused, along with his "[good behavior] in the meantime," were consistent with statutory law in existence at the time of the adoption of the 1818 and 1965 state constitutions, as explicated in *Ayala* and *State* v. *Menillo*, supra, 159 Conn. 264; (internal quotation marks omitted) *State* v. *Anderson*, supra, 305 n.28; we concluded in *Anderson* that "the imposition of a bond for the purpose of ensuring public safety is a constitutionally sound practice." Id., 303; see id., 305–306 (noting amendment of § 54-64a in 1990 to require trial courts to consider imposition of conditions of release that will both ensure appearance of accused and protect safety of " 'any other person' ").

Moreover, in rejecting Anderson's argument that "the amount of bail that the trial court set was unreasonable due to his indigence," we quoted *State* v. *Menillo*, supra, 159 Conn. 269, for the proposition that " 'a reasonable amount [of bail] is not necessarily an amount within

the power of an accused to raise' but, rather, an amount that is reasonable under all of the relevant circumstances." *State* v. *Anderson*, supra, 319 Conn. 308; see id., 308–309 (The court cited the victim's rights amendment to the state constitution; see Conn. Const., amend. XXIX; and emphasized that "the trial court properly considered the factors set forth in § 54-64a (b) (2) and how those factors bore on the issue of the danger that [Anderson] posed to other persons. In other words, the court [properly] considered the need to ensure the safety of others, regardless of whether [Anderson] was a potential flight risk."). Ultimately, we concluded in *Anderson* that the trial court had not denied Anderson his state constitutional right to bail when it "properly set a monetary bond as a condition of [his] release as a means to ensure the safety of other persons." Id., 309.

Our decision in *Anderson* plainly demonstrates that the defendant in the present case is not constitutionally entitled to a bail that he can afford, notwithstanding his argument that the $20 million amount imposed constituted a functional denial of the right to bail. Indeed, *Anderson* rejects outright the concept of a functional denial of bail, insofar as it relies repeatedly on the fact that the trial court in that case had in fact extended a bond to Anderson, despite his obvious inability to meet it. See *State* v. *Anderson*, supra, 319 Conn. 307 and n.31. Thus, with an unaffordable bail not prohibited per se under our state constitution, the remaining issue regarding the amount of the bond is whether $20 million was in fact unreasonable under the circumstances of this case, which would render it an abuse of the trial court's discretion in setting bond amounts and conditions.[19]

Having reviewed the record in this case, we conclude that Judge Harmon did not abuse his discretion in determining that, under the factors set forth in by Practice Book § 38-4 (d); see footnote 10 of this opinion; a $20 million bond amount was appropriate. Judge Harmon's conclusions, which are consistent with the factual findings set forth in Judge Fischer's detailed articulation; see footnote 9 of this opinion; indicate that this particular defendant presents a uniquely significant flight risk, which is compounded by the violence of the crime with which he was charged and the lengths to which he went to avoid detection and apprehension. Put differently, this case is a paradigmatic example of one in which a bond amount that is so high that it might well be beyond the ability of the defendant to afford is nevertheless reasonable, even if the high amount effectively serves as the denial of bond.

Indeed, this case presents an example of the quixotic

nature of the trial judge's endeavor to attempt to set a bond that is numerically ideal in light of the competing demands of ensuring the defendant's presence at trial and the safety of the community while simultaneously safeguarding, to the maximum extent feasible, the defendant's constitutional liberty interests. With minimal evidence in the record as to the defendant's financial resources, both at arraignment and at the modification hearing, Judges Fischer and Harmon were left to rely on the conflicting representations of counsel for both the state and the defendant, which painted diametrically opposed pictures of the defendant's financial ability to make bond. The defendant, through counsel, characterized himself as the child of middle class retirees who was solely dependent on his $30,000 graduate student stipend for income, whereas the prosecutor represented that the defendant and his family had access to copious amounts of money wired in from China that had been flagged by the United States Department of the Treasury as suspicious transfers several times in recent years. The extent to which the houses owned by the defendant's parents in Massachusetts were available as assets was also unclear.[20] What is clear, however, is that the defendant had access to sufficient financial resources to render himself a significant flight risk; he had already fled Connecticut and lived under an assumed name in Alabama for several months while being pursued by numerous federal and state law enforcement agencies, and he was apprehended in possession of more than $19,000 in cash, a computer, multiple cell phones, and his father's passport. This evidence of flight is particularly compelling in light of probable cause to believe that the defendant had engaged in other highly evasive behavior in connection with this homicide, including creating a false trail to elude the police after the crime and stealing a GMC Terrain from a dealership in Massachusetts in an attempt to link his crime to drive-by shooting attempts from that vehicle on the same day as the victim's death. Although the $20 million bond is extremely high, it nevertheless was not an abuse of discretion in view of the unique facts of this case.

B

Whether Judge Harmon Correctly Concluded that He Lacked Discretion To Consider the Defendant's Request for a 10 Percent Cash Option

We now turn to the defendant's claim that Judge Harmon incorrectly concluded that he lacked the authority to offer a 10 percent cash bail option upon

defense counsel's request. The trial court's authority to offer a 10 percent cash bail option is governed by Practice Book § 38-8, which provides in relevant part: "Unless otherwise ordered by the judicial authority, 10 percent cash bail shall be automatically available for surety bonds not exceeding $20,000. *For surety bond amounts exceeding $20,000, 10 percent cash bail may be granted pursuant to an order of the judicial authority.* This 10 percent option applies to bonds set by [the] court as well as bonds set at the police department. . . ." (Emphasis added.) See also Practice Book § 38-4 (c) (4) (cross-referencing § 38-8 and providing for 10 percent cash option as financial condition of release for serious offenses).

The plain language of Practice Book § 38-8 expressly provides that the trial court has the authority to offer a 10 percent cash bail option in all cases. Under that rule of practice, the $20,000 bond amount that Judge Harmon considered a "top level" or ceiling determines only whether the 10 percent cash bail option is automatic, or whether it must specifically be ordered by the trial court, for bonds above that threshold. Accordingly, Judge Harmon incorrectly concluded that he lacked discretion to offer the defendant a 10 percent cash bail option.

"Although it is normally true that this court will refrain from interfering with a trial court's exercise of discretion . . . this presupposes that the trial court did in fact exercise its discretion. [D]iscretion imports something more than leeway in decision-making. . . . It means a legal discretion, to be exercised in conformity with the spirit of the law and in a manner to subserve and not to impede or defeat the ends of substantial justice." (Internal quotation marks omitted.) *Austin-Casares* v. *Safeco Ins. Co. of America*, 310 Conn. 640, 654, 81 A.3d 200 (2013). Put differently, "[i]n the discretionary realm, it is improper for the trial court to fail to exercise its discretion." *State* v. *Lee*, 229 Conn. 60, 73–74, 640 A.2d 553 (1994). Accordingly, we conclude that remand to the trial court is required so that the trial court may exercise its discretion whether to allow a 10 percent cash bail option.[21] See, e.g., *Gelinas* v. *West Hartford*, 225 Conn. 575, 596, 626 A.2d 259 (1993) (concluding that trial court had abused its discretion in failing to enjoin property owner from activities that violated town's zoning ordinance, and remanding case with direction to render judgment for town while "leav [-ing] it to the discretion of the trial court to fashion the scope of the injunctive relief to which the town

is entitled").

## II
## PROCEDURAL PROTECTIONS FOR STATE
## CONSTITUTIONAL RIGHT TO BAIL

Although this case is atypical given the obvious and verifiable flight risk presented by the defendant, who stands accused of committing a violent homicide, the broader issues presented in this petition—in particular, whether the $20 million bond functioned as an effective denial of the right to bail guaranteed by article first, § 8, of our state constitution—are not unique and lead us to consider whether our state's current bail hearing procedures, as implemented by our trial courts under Connecticut's relevant statutes and rules of practice, adequately protect that constitutional right. In particular, the extensive arguments before the trial court concerning the defendant's financial resources—which, as noted in part I of this opinion, were presented to the trial court via counsels' diametrically opposed representations concerning his family's finances and foreign ties—raise two fundamental questions: (1) Are trial courts receiving sufficient information to make an informed determination as to a defendant's financial resources for the purpose of setting a reasonable bond? And (2) under what conditions is an unaffordable bail amount nonetheless reasonable and, thus, constitutionally permissible? The correlation between the bail amount and the defendant's ability to pay is of vital constitutional importance because a "bail that is set without any regard to whether a defendant is a pauper or a plutocrat runs the risk of being excessive and unfair. A $250 cash bail will have little impact on the well-to-do, for whom it is less than the cost of a night's stay in a downtown Boston hotel, but it will probably result in detention for a homeless person whose entire earthly belongings can be carried in a cart. What would be a reasonable bail in the case of one defendant may be excessive in the case of another." (Internal quotation marks omitted.) *Brangan* v. *Commonwealth*, 477 Mass. 691, 699–700, 80 N.E.3d 949 (2017).

The merits issues discussed in part I of this opinion—including the vast disparity in the parties' representations with respect to the financial and foreign resources available to the defendant and his family, as those considerations relate to the defendant's risk of flight—suggest that our existing procedures may not be adequate to ensure that our Superior Court judges are making fully informed decisions on bail matters. Insofar as a remand is required to the trial court to consider the

10 percent cash option, and to the extent that either party may file a motion for modification of bond that would allow the parties to introduce actual evidence as to the financial resources available to the defendant (or evidence as to any other relevant factors to be considered when imposing bail), we consider it appropriate to clarify the procedures that our trial courts currently utilize in conducting bail modification hearings. See, e.g., *State* v. *Manuel T.*, 337 Conn. 429, 437 n.7, 254 A.3d 278 (2020) (court may address issues of law that are likely to arise on remand).

In clarifying the procedures that our trial courts utilize in conducting bail modification hearings, we find instructive a recent body of case law from our neighbor Massachusetts, the constitution of which does not have a bail provision but which considers issues of pretrial detention or functional denials of bail to be matters of fundamental due process. See *Querubin* v. *Commonwealth*, 440 Mass. 108, 112–13 n.4, 795 N.E.2d 534 (2003) (noting that eighth amendment to United States constitution and article 26 of Massachusetts Declaration of Rights limit constitutional protection only to " 'excessive' bail"). In 2017, the Massachusetts Supreme Judicial Court held in *Brangan* v. *Commonwealth*, supra, 477 Mass. 691, that, when "a judge sets bail in an amount so far beyond a defendant's ability to pay that it is likely to result in long-term pretrial detention, it is the functional equivalent of an order for pretrial detention, and the judge's decision must be evaluated in light of the same due process requirements applicable to such a deprivation of liberty." Id., 705. In *Brangan*, the court held that, when, "based on a defendant's credible representations and any other evidence before the judge, it appears that the defendant lacks the financial resources to post the amount of bail set by the judge, such that it will likely result in the defendant's long-term pretrial detention, the judge must provide findings of fact and a statement of reasons for the bail decision, either in writing or orally on the record," including the "consideration of the defendant's financial resources . . . how the bail amount was [determined], and . . . why, [even though] the bail amount will likely result in the defendant's detention, the defendant's risk of flight is so great that no alternative, less restrictive financial or nonfinancial conditions will suffice to [en]sure his or her presence at future court proceedings." (Footnote omitted.) Id., 707; see *Juvenile* v. *Commonwealth*, 480 Mass. 1012, 1013–15, 103 N.E.3d 742 (2018) (fact that juvenile fled from custody of child welfare department for three months and was "a 'runaway' " at time of

arrest supported trial court's finding under *Brangan* that there was no reasonable alternative to unaffordable bail). The court in *Brangan* also emphasized that, in bail review or modification proceedings, the trial court must consider the length of the detention and "the equities of the case" at that point in the proceedings. *Brangan* v. *Commonwealth*, supra, 710.

Subsequently, in *Walsh* v. *Commonwealth*, 485 Mass. 567, 582, 15 N.E.3d 840 (2020), the Massachusetts Supreme Judicial Court elaborated on the nature of the hearing and the quantum of proof required under its holding in *Brangan*, which had been codified in Massachusetts' bail statutes. In *Walsh*, the court recognized the need to balance the serious consequences of detaining a defendant before trial, including the negative effects on that person's employment and ability to assist with his or her defense; see id., 579; against the fact that "bail decisions often involve difficult judgment calls made under challenging circumstances," including relatively "limited information" from the representations of counsel and police and probation reports. Id., 580. Observing that the Massachusetts bail statute imposes a presumption in favor of release on personal recognizance, the court explained that the commonwealth could rebut that presumption by demonstrating, by a preponderance of the evidence, "a history of prior court defaults or [by presenting] evidence that the defendant poses a flight risk, or [by reference to] the other factors listed in the [Massachusetts] bail statutes . . . ."[22] (Footnote omitted.) Id., 584. *Walsh* also requires the trial court to consider whether nonfinancial conditions of release will ensure the defendant's presence in court. If the trial court determines that the presumption in favor of release on personal recognizance has been overcome and that nonfinancial conditions of release are "inadequate," it must set bail by "try[ing] to determine what amount the defendant can reasonably afford to post," and "then determine the amount of bail that is necessary to [en]sure the defendant's appearance," which "may be more than what the defendant can reasonably afford." Id., 586–87. The Massachusetts Supreme Judicial Court concluded that, if bail is set in an amount beyond which the defendant can afford, the judge must provide a statement of reasons—in writing or on the record—"the particular circumstances and factors that have led the judge to conclude that the presumption of release on personal recognizance has been rebutted, that nonfinancial conditions and a lesser bail amount

would be inadequate, and that the [c]ommonwealth's interest in this bail amount outweighs the potential adverse impact of pretrial detention on the defendant and his or her immediate family or dependents." Id., 588.

The procedural steps prescribed in *Brangan* and *Walsh* are particularly well suited for careful consideration in Connecticut given their congruence with the policy preference expressed in Connecticut's bail statute and the rules of practice for the imposition of the first—or least restrictive—of the four enumerated "conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered," namely, (1) a defendant's "execution of a written promise to appear without special conditions," (2) a defendant's "execution of a written promise to appear with nonfinancial conditions," (3) a defendant's "execution of a bond without surety in no greater amount than necessary," or (4) a defendant's "execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety." General Statutes (Supp. 2022) § 54-64a (b) (1) (A) through (D), as amended by P.A. 22-37, § 38; see General Statutes (Supp. 2022) § 54-64a (c), as amended by P.A. 22-37, § 38 (nonfinancial conditions of release must be "the least restrictive condition or combination of conditions that the court determines will reasonably ensure the appearance of the arrested person in court and . . . that the safety of any other person will not be endangered"). Indeed, our state's bail statute and the rules of practice specifically require the court, "[w]hen imposing conditions of release," to "state for the record" the statutory "factors . . . that it considered and the findings that it made as to the danger, if any, that the arrested person might pose to the safety of any other person upon the arrested person's release that caused the court to impose the specific conditions of release that it imposed." General Statutes (Supp. 2022) § 54-64a (b) (3), as amended by P.A. 22-37, § 38; see General Statutes (Supp. 2022) § 54-64a (b) (2), as amended by P.A. 22-37, § 38 (setting forth statutory factors guiding release determination); Practice Book § 38-4 (c) and (d) (prescribing trial court's responsibilities in determining conditions of release).

We now must clarify the procedures that are used in Connecticut to ensure that our trial courts set bond in compliance with the constitutional requirement of reasonableness. The bond determination made at arraignment is our starting point. We recognize the "heavy

flow of judicial business in the busy geographical area courts during arraignment sessions"; *State* v. *Fernando A.*, 294 Conn. 1, 24, 981 A.2d 427 (2009); along with the fact that it may be difficult at the time of a defendant's arraignment for the parties to marshal the evidence necessary to hold a meaningful hearing in a relatively complex case involving high bonds, such as the present case. Given the press of business during arraignment proceedings, and the frequent unavailability at that early time of actual evidence as to the defendant's financial ability to make a bond, the trial court should exercise its discretion to impose an initial bond in accordance with the relevant statutory and Practice Book factors, as it always has, guided by any available evidence and representations from counsel. In short, we have no reason at this time to believe that the existing procedures in place for the initial bond determination at arraignment require alteration.

We are mindful, however, that pretrial detention may carry very serious consequences in addition to, and as a result of, the defendant's loss of liberty. Pretrial detention can affect employment situations, housing arrangements and family relationships, and also increases the likelihood of a criminal conviction, either by interfering with the defendant's ability to assist in his own defense or by increasing the possibility of a guilty plea. See, e.g., *In re Humphrey*, 11 Cal. 5th 135, 143, 147–48, 482 P.3d 1008, 276 Cal. Rptr. 3d 232 (2021); J. Carroll, "Beyond Bail," 73 Fla. L. Rev. 143, 184–85 (2021); L. Gouldin, "Reforming Pretrial Decision-Making," 55 Wake Forest L. Rev. 857, 871–72 (2020); S. Mayson, "Dangerous Defendants," 127 Yale L.J. 490, 546–47 and n.257 (2018). Indeed, there is "a growing body of empirical data [that] shows that those subjected to pretrial detention suffer harsher outcomes in their pending criminal cases than do defendants released pretrial." C. Jones, "Accused and Unconvicted: Fleeing from Wealth-Based Pretrial Detention," 82 Alb. L. Rev. 1063, 1068–69 (2018–2019).

We believe that it is critical that a defendant have a meaningful opportunity to seek review of his initial bond through a more extensive hearing process than was initially held at arraignment. Accordingly, should a defendant be unable to make the initial bond set at arraignment, and counsel has a good faith basis to believe modification is warranted, the defendant may file a motion for modification of bond pursuant to Practice Book § 38-14. Consistent with the "reasonable promptness" requirement of Practice Book § 38-17 (a), the trial

court shall then schedule the matter on an expedited basis for a more extensive hearing than is feasible at arraignment, at which financial and nonfinancial conditions may be considered without prejudice to the defendant.[23] See *State* v. *Fernando A.*, supra, 294 Conn. 24–25. At that hearing, the defendant—as the moving party[24]— would bear the initial burden of presenting information, including evidence and reliable hearsay, that would allow the trial court to make a threshold determination that the bond set at arraignment is unaffordable, taking into consideration the factors enumerated in § 54-64a (b) (2). See also Practice Book § 38-4 (d).[25]

With respect to the type of proof required at this bond modification hearing, we recognize that a "bail proceeding . . . is not intended to be a mini-trial, and the rules of evidence do not apply. A full-blown evidentiary hearing that includes the right to present and cross-examine witnesses is not needed or required. However, such a hearing, or some variation, may be held in the discretion of the judge when the circumstances of a particular case warrant." *Querubin* v. *Commonwealth*, supra, 440 Mass. 118. Although the rules of evidence do not apply during a bond modification hearing, we conclude that neither the defendant nor the state may rely solely on simple representations of counsel to meet their respective burdens. Rather, the parties may proceed by proffer, supported by reliable hearsay evidence, relevant documents, and other documentary or testimonial evidence.[26] Cf. *State* v. *Fernando A.*, supra, 294 Conn. 26–28. The court may also consider any additional information or recommendations from the bail commissioner and the victim's advocate.

After the defendant, as the movant, presents his information supporting his claim as to the unaffordability of the bond set at arraignment, the state then must bear the burden of presenting information, including evidence and reliable hearsay, to demonstrate that the bond is in fact reasonable under the circumstances of the case, after consideration of the factors set forth in § 54-64a (b) (2). See also Practice Book § 38-4 (d). These factors include "(A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past record of appearance in court after being admitted to bail, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources, character and mental condition, (G) such person's community ties, (H) the number and seriousness of charges pending against the arrested person, (I) the weight of the evidence against

the arrested person, (J) the arrested person's history of violence, (K) whether the arrested person has previously been convicted of similar offenses while released on bond, (L) the likelihood based upon the expressed intention of the arrested person that such person will commit another crime while released, and (M) the heightened risk posed to victims of family violence by violations of conditions of release and court orders of protection." General Statutes (Supp. 2022) § 54-64a (b) (2), as amended by P.A. 22-37, § 38; see also Practice Book § 38-4 (d).

The issue of what standard of proof is necessary for the state to establish that the imposition of a bond of a particular amount is in fact reasonable under the circumstances of a particular case, as is required by our state constitution, is a question of first impression under Connecticut law.[27] See *State* v. *Anderson*, supra, 319 Conn. 308; *State* v. *Menillo*, supra, 159 Conn. 269. Although there is some recent authority from sister state courts requiring that showing to be made by clear and convincing evidence as a matter of state constitutional law, we nevertheless agree with the Massachusetts Supreme Judicial Court that the state bears the burden of showing by a preponderance of the evidence that the imposition of a bond at a certain amount is in fact reasonable under the circumstances of a particular case. See *Walsh* v. *Commonwealth*, supra, 485 Mass. 590; see also *State* v. *Fernando A.*, supra, 294 Conn. 25–26 (state must prove "continued necessity" for criminal protective order imposed at arraignment pursuant to General Statutes §§ 54-63c (b) and 46b-38c (d) as condition of release in family violence case "by a fair preponderance of the evidence"); *State* v. *Menillo*, supra, 281 (state bears burden of proving that case is subject to state constitutional exception for capital cases in which "the proof is evident or the presumption great"). As a practical matter, the use of the preponderance of the evidence standard reflects the nature of the bond determination, under which "the amount of bail that will reasonably [en]sure the defendant's presence at trial involves the presentation of evidence that, in the vast majority of cases, is undisputed, a matter of public record, or readily explained. It also involves the application of factors, previously noted, that are familiar, straightforward, and relatively simple." *Querubin* v. *Commonwealth*, supra, 440 Mass. 118; see *State* v. *Hill*, 172 N.H. 711, 720, 234 A.3d 248 (2019) (state bail statute permits "a trial court to set unaffordable bail that results in detention based solely [on] the court's determination that an arrestee poses a flight risk" that

cannot be mitigated by imposition of conditions of release, which showing must be made by preponderance of evidence). Accordingly, we conclude that the state is required to demonstrate, by a preponderance of the evidence, that the amount of the bond set is in fact reasonable under the circumstances of the case, in light of all the statutory factors that the court setting the bond may take into consideration.

Following the modification hearing, the trial court must make a de novo determination regarding whether the bond initially set is reasonable. If the court determines that the initial bond is unreasonable, it must set a new, reasonable bond. In making this determination, we agree with the Massachusetts Supreme Judicial Court that, when "it appears that the defendant lacks the financial resources to post the amount of bail set by the judge, such that it will likely result in the defendant's long-term pretrial detention, the judge must provide findings of fact and a statement of reasons for the bail decision, either in writing or orally on the record," including the "consideration of the defendant's financial resources . . . how the bail amount was [determined], and . . . why . . . [after consideration of the factors set forth in § 54-64a (b) (2)] no alternative, less restrictive financial or nonfinancial conditions will suffice to [en]sure his or her presence at future court proceedings." (Footnote omitted.) *Brangan* v. *Commonwealth*, supra, 477 Mass. 707; see also General Statutes § 54-64a (b) (3); Practice Book § 38-4 (d). In making these findings, "the judge must do more than articulate the animating rationale for that determination and indicate in a general way that he or she has considered the relevant factors." *Walsh* v. *Commonwealth*, supra, 485 Mass. 582. Although the judge is not obligated "to articulate a detailed factor-by-factor analysis as to why the amount of the bail is appropriate, or to specify each less restrictive alternative that has been considered and why each has been rejected"; id.; the judge nevertheless must provide a sufficient articulation as to the reasoning for the amount set to ensure that an appellate court has sufficient information to assess whether the trial court abused its discretion in concluding that the amount of the bond is reasonable even though it will likely result in the defendant's detention, and that no alternative, less restrictive financial or nonfinancial conditions will suffice to ensure his or her presence at future court proceedings and the safety of others. See *Brangan* v. *Commonwealth*, supra, 706–707; see also *Sergie* v. *State*, Docket No. A-13863, 2021 WL 3277199, *3 (Alaska App. July 30, 2021) ("a trial court that sets a monetary

bail above the defendant's ability to pay must provide a 'particularized statement' that addresses how the monetary amount was [determined] and that directly explains 'why no less restrictive conditions will suffice' "). In other words, the trial court must correlate the facts of the case based on the evidence and credible information received at the modification hearing to the specific amount of bond set and explain why that amount is reasonable. Given the important liberty interests at stake, this requirement of enhanced findings will expedite appellate review of the bond determination under General Statutes § 54-63g and Practice Book § 78a-1 and avoid the delays and inconvenience inherent in the standard articulation process. See Practice Book §§ 66-5 and 66-7.

In sum, the existing procedures in place for the initial bond determination remain the same. Either party may move for modification of a bond if it has a good faith basis to believe that a modification of that initial bond determination is warranted. If the defendant files the motion based on a claim that the existing bond is unaffordable, the defendant bears the initial burden of presenting information, either through evidence or reliable hearsay, that would allow the trial court to make a threshold determination that the defendant does not have access to financial resources to afford the bond set at arraignment. Upon such a showing, the state then bears the burden of demonstrating, by a preponderance of the evidence, that the bond is in fact reasonable in light of the factors set forth in § 54-64a (b) (2) and Practice Book § 38-4 (d). Thereafter, the trial court must make a de novo determination regarding whether the bail initially set is reasonable, and, if it not reasonable, the trial court must set a new bail amount. In connection with its determination, the trial court must articulate findings and reasoning sufficient to ensure that an appellate court has adequate information to assess the trial court's exercise of discretion in setting the bond in an amount that is permitted by law.

[1] The defendant filed a petition with the Appellate Court for review of the trial court's denial of his motion for modification of his bond pursuant to General Statutes § 54-63g and Practice Book § 78a-1, and we transferred the petition to this court. See Practice Book § 65-3.

[2] Practice Book § 38-8 provides: "Unless otherwise ordered by the judicial authority, 10 percent cash bail shall be automatically available for surety bonds not exceeding $20,000. For surety bond amounts exceeding $20,000, 10 percent cash bail may be granted pursuant to an order of the judicial authority. This 10 percent option applies to bonds set by court as well as bonds set at the police department.

"When 10 percent cash bail is authorized either automatically or pursuant to court order, upon the depositing in cash, by the defendant or any person in his or her behalf other than a paid surety, of 10 percent of the surety

bond set, the defendant shall thereupon be admitted to bail in the same manner as a defendant who has executed a bond for the full amount. If such bond is forfeited, the defendant shall be liable for the full amount of the bond. Upon discharge of the bond, the 10 percent cash deposit made with the clerk shall be returned to the person depositing the same, less any fee that may be required by statute."

[3] For convenience, all subsequent references to the trial court will be by name to Judge Harmon or Judge Fischer.

[4] For a more detailed factual recitation of the allegations against the defendant and the circumstances under which he was apprehended, see Judge Fischer's articulation, which is set forth in footnote 9 of this opinion.

[5] Judge Fischer ordered that bond could be "posted . . . only in the courthouse so the court can then address nonfinancial conditions of release." Judge Fischer also imposed a protective order for the protection of the victim's fiancée and ordered the defendant to turn over to the local police in Malden, Massachusetts, any firearms or weapons that he owned or possessed.

[6] The defendant initially filed a petition with the Appellate Court for review of Judge Fischer's order pursuant to General Statutes § 54-63g and Practice Book § 78a-1, and we transferred the petition to this court pursuant to Practice Book § 65-3.

[7] Practice Book § 38-14 provides: "Whenever the prosecuting authority or the defendant alleges that any bond with or without surety is excessive or insufficient in amount or security or that the written promise of the defendant to appear is inadequate, that person may make a motion to a judicial authority to modify or set terms and conditions of release. Such motion shall be served prior to the hearing date upon the opposing party, the sureties upon any bond and the appropriate bail commissioner, unless otherwise ordered by the judicial authority."

[8] General Statutes (Supp. 2022) § 54-64a, as amended by P.A. 22-37, § 38, provides in relevant part: "(b) (1) When any arrested person charged with the commission of a class A felony, a class B felony, except a violation of section 53a-86 or 53a-122, a class C felony, except a violation of section 53a-87, 53a-152 or 53a-153, or a class D felony under sections 53a-60 to 53a-60c, inclusive, section 53a-72a, 53a-95, 53a-103, 53a-103a, 53a-114, 53a-136 or 53a-216, or a family violence crime, as defined in section 46b-38a, is presented before the Superior Court, said court shall, in bailable offenses, promptly order the release of such person upon the first of the following conditions of release found sufficient to reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered: (A) Upon such person's execution of a written promise to appear without special conditions, (B) upon such person's execution of a written promise to appear with nonfinancial conditions, (C) upon such person's execution of a bond without surety in no greater amount than necessary, or (D) upon such person's execution of a bond with surety in no greater amount than necessary, but in no event shall a judge prohibit a bond from being posted by surety. In addition to or in conjunction with any of the conditions enumerated in subparagraphs (A) to (D), inclusive, of this subdivision, the court may, when it has reason to believe that the person is drug-dependent and where necessary, reasonable and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such person.

"(2) The court may, in determining what conditions of release will reasonably ensure the appearance of the arrested person in court and that the safety of any other person will not be endangered, consider the following factors: (A) The nature and circumstances of the offense, (B) such person's record of previous convictions, (C) such person's past record of appearance in court after being admitted to bail, (D) such person's family ties, (E) such person's employment record, (F) such person's financial resources,

character and mental condition, (G) such person's community ties, (H) the number and seriousness of charges pending against the arrested person, (I) the weight of the evidence against the arrested person, (J) the arrested person's history of violence, (K) whether the arrested person has previously been convicted of similar offenses while released on bond, and (L) the likelihood based upon the expressed intention of the arrested person that such person will commit another crime while released, and (M) the heightened risk posed to victims of family violence by violations of conditions of release and court orders of protection.

"(3) When imposing conditions of release under this subsection, the court shall state for the record any factors under subdivision (2) of this subsection that it considered and the findings that it made as to the danger, if any, that the arrested person might pose to the safety of any other person upon the arrested person's release that caused the court to impose the specific conditions of release that it imposed.

"(c) If the court determines that a nonfinancial condition of release should be imposed pursuant to subparagraph (B) of subdivision (1) of subsection (a) or (b) of this section, the court shall order the pretrial release of the person subject to the least restrictive condition or combination of conditions that the court determines will reasonably ensure the appearance of the arrested person in court and, with respect to the release of the person pursuant to subsection (b) of this section, that the safety of any other person will not be endangered, which conditions may include an order that the arrested person do one or more of the following: (1) Remain under the supervision of a designated person or organization; (2) comply with specified restrictions on such person's travel, association or place of abode; (3) not engage in specified activities, including the use or possession of a dangerous weapon, an intoxicant or a controlled substance; (4) provide sureties of the peace pursuant to section 54-56f under supervision of a designated bail commissioner or intake, assessment and referral specialist employed by the Judicial Branch; (5) avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense; (6) maintain employment or, if unemployed, actively seek employment; (7) maintain or commence an educational program; (8) be subject to electronic monitoring; or (9) satisfy any other condition that is reasonably necessary to ensure the appearance of the person in court and that the safety of any other person will not be endangered. The court shall state on the record its reasons for imposing any such nonfinancial condition.

"(d) If the arrested person is not released, the court shall order him committed to the custody of the Commissioner of Correction until he is released or discharged in due course of law. . . ."

We recognize that § 54-64a has been amended since this court ordered, and Judge Fischer issued, an articulation. See Public Acts 2021, P.A. 21-78, § 16 (adding subparagraph (M) to § 54-64a (b) (2), among other changes); see also P.A. 22-37, § 38 (making technical changes). In the interest of simplicity, we refer to the current revision of the statute.

[9] In his articulation, Judge Fischer set forth "the following findings of facts and the factors considered in setting bond:

"(1) The defendant is accused of the murder of [the victim] in . . . New Haven on February 6, 2021.

"(2) The victim was found lying in the middle of a road with multiple gunshot wounds to his head and body.

"(3) The defendant is a Massachusetts resident with no ties to Connecticut. He is thirty years old.

"(4) Subsequent to the homicide, numerous police departments obtained arrest warrants [for] the defendant. Attempts to serve these warrants on the defendant were unsuccessful.

"(5) A nationwide manhunt was conducted to find the defendant after the homicide [which involved numerous federal, state and local] law enforcement agencies . . .

\* \* \*

"(6) After three months on the run, the defendant was captured on May 13, 2021.

"(7) The defendant was captured in an apartment that he was renting in Montgomery, Alabama.

"(8) The defendant rented the apartment under the false name of Henry Coi.

"(9) At the time of his capture, the defendant was in possession of $19,000 in cash, seven cell phones, and seven different [subscriber identity module (SIM)] cards.

"(10) The defendant was also in possession of his father's passport. The defendant's parents are from China, and the defendant has been in the United States since 2007.

"(11) The defendant was born in Shanghai, China, and has ties to that area.

"(12) The defendant is a [United States] citizen and has no criminal record.

"(13) The defendant was unemployed on February 6, 2021.

"(14) Prior to the arraignment, [Judge Fischer] reviewed the arrest warrant for the murder of [the victim] and finds [that] the state . . . has an extremely strong case against the defendant for the murder of [the victim].

"(15) The defendant himself had $19,000 in cash on him at the time of his capture. His financial resources appear substantial. Although unemployed, he was able to obtain transportation [and] lodging, [to] secure an apartment, and [to] feed himself for [more than] three months, and still have $19,000 in cash on him at the time of his capture."

[10] Practice Book § 38-4 provides in relevant part: "(c) When any defendant charged with a serious felony enumerated in . . . § 54-64a (b) (1) or a family violence crime is presented before a judicial authority, such authority shall, in bailable offenses, promptly order the release of such defendant upon the first of the following conditions of release found sufficient to reasonably ensure the defendant's appearance in court and that the safety of any other person will not be endangered:

"(1) The defendant's execution of a written promise to appear without special conditions;

"(2) The defendant's execution of a written promise to appear with nonfinancial conditions;

"(3) The defendant's execution of a bond without surety in no greater amount than necessary;

"(4) The defendant's deposit with the clerk of the court of an amount of cash equal to 10 percent of the amount of the surety bond set, pursuant to Section 38-8;

"(5) The defendant's execution of a bond with surety in no greater amount than necessary.

"In no event shall the judicial authority prohibit a bond from being posted by surety.

"(d) The judicial authority may, in determining what conditions of release will reasonably ensure the appearance of the defendant in court and that the safety of any other person will not be endangered pursuant to subsection (c) of this section, consider the following factors:

"(1) The nature and circumstances of the offense;

"(2) The defendant's record of previous convictions;

"(3) The defendant's past record of appearance in court after being admitted to bail;

"(4) The defendant's family ties;

"(5) The defendant's employment record;

"(6) The defendant's financial resources, character and mental condition;

"(7) The defendant's community ties;

"(8) The number and seriousness of the charges pending against the defendant;

"(9) The weight of evidence against the defendant;

"(10) The defendant's history of violence;

"(11) Whether the defendant has previously been convicted of similar offenses while released on bond; and

"(12) The likelihood based upon the expressed intention of the defendant that he or she will commit another crime while released.

"When imposing conditions of release under subsection (c) of this section, the court shall state for the record any factors under subsection (d) of this section that it considered and the findings that it made as to the danger, if any, that the defendant might pose to the safety of any other person upon the defendant's release that caused the court to impose the specific conditions of release that it imposed.

\* \* \*

"(f) In addition to or in conjunction with any of the conditions enumerated in subsection (a) or (c) of this section, the judicial authority may, when it has reason to believe that the defendant is drug-dependent and where necessary, reasonable, and appropriate, order the person to submit to a urinalysis drug test and to participate in a program of periodic drug testing and treatment. The results of any such drug test shall not be admissible in any criminal proceeding concerning such defendant.

"(g) If the judicial authority determines that a nonfinancial condition of release should be imposed in addition to or in conjunction with any of the conditions enumerated in subsection (a) or (c) of this section, the judicial authority shall order the pretrial release of the defendant subject to the least restrictive condition or combination of conditions that the judicial authority determines will reasonably ensure the appearance of the defendant in court and, when the defendant is charged with a felony enumerated in . . . § 54-64a (b) (1) or a family violence crime, that the safety of any person will not be endangered, which conditions may include an order that he or she do one or more of the following:

"(1) Remain under the supervision of a designated person or organization;

"(2) Comply with specified restrictions on his or her travel, association, or place of abode;

"(3) Not engage in specified activities, including the use or possession of a dangerous weapon, an intoxicant or a controlled substance;

"(4) Provide sureties of the peace pursuant to General Statutes § 54-56f under supervision of a designated bail commissioner or intake, assessment and referral specialist;

"(5) Avoid all contact with an alleged victim of the crime and with a potential witness who may testify concerning the offense;

"(6) Maintain employment or, if unemployed, actively seek employment;

"(7) Maintain or commence an educational program;

"(8) Be subject to electronic monitoring; or

"(9) Satisfy any other condition that is reasonably necessary to ensure the appearance of the defendant in court and that the safety of any other person will not be endangered.

"The judicial authority shall state on the record its reasons for imposing any such nonfinancial condition.

\* \* \*

"(i) If any defendant is not released, the judicial authority shall order the defendant committed to the custody of the Commissioner of Correction until he or she is released or discharged in due course of law."

[11] Practice Book § 38-17 provides: "(a) Upon the filing and service of such motion or application, the judicial authority shall, with reasonable promptness, conduct a hearing to determine whether the terms and conditions of release should be continued, modified or set. The judicial authority shall release the defendant subject to and in accordance with the provisions of Section 38-4 upon the first of the following conditions of release found sufficient to provide reasonable assurance of the appearance of the defendant in court:

"(1) The defendant's execution of a written promise to appear;

"(2) The defendant's execution of a bond without surety in no greater amount than necessary;

"(3) The defendant's deposit with the clerk of the court of an amount equal to 10 percent of the surety bond set, pursuant to Section 38-8;

"(4) The defendant's execution of a bond with surety in no greater amount than necessary.

"(b) If, after such hearing, the judicial authority relieves a surety of his or her undertaking on a bond, it may enter such order contingent upon the return of such portion of the bond fee as it deems equitable."

[12] The state also corrected the record about the number of electronic devices and the quantity of cash that the defendant had in his possession when he was apprehended. The prosecutor represented to the trial court that updated information from law enforcement agencies indicated that, when apprehended, the defendant had in his possession four, rather than seven, cell phones, three charging cords, an activation package for a Tracfone prepaid cell phone, three Tracfone gift cards, one set of ear buds, an Acer laptop computer, his leather wallet, his father's passport, and $19,191 in cash.

[13] Responding to the prosecutor's argument, defense counsel posited that Judge Harmon "was aware of 90 percent of this [information] when [he] signed the warrant and set the bond at $5 million." Counsel voiced the defendant's concern that he would "be subject to prejudice" at a trial held in New Haven because of his ethnicity and the fact that the victim was a student at Yale University. With respect to flight, defense counsel contended that the defendant's rental of an apartment was indicative of his intent to stay in place and reiterated his willingness to live in Connecticut pending trial. Finally, counsel emphasized this court's July 20 order seeking a "correlation" between the bond amount set and the risk, asking "[h]ow does the court say that this much money will [en]sure [the defendant's] release and that much money won't," again suggesting that a $2 or $3 million bond would be appropriate.

[14] Consistent with Judge Fischer's earlier ruling; see footnote 5 of this opinion; Judge Harmon further ordered that, if the defendant "were to make bond," he would have to post it at the courthouse to allow the court to "issue the appropriate conditions," such as home confinement or electronic monitoring.

[15] The defendant further observes that the amount of his bond greatly exceeds the amounts imposed in other recent high profile homicide cases involving wealthy defendants and "exceptionally disturbing facts," including the $6 million bond imposed on Fotis Dulos, who had "substantial ties to Greece" and was accused of killing his wife and hiding her body, and the total of $12 million in bonds imposed on Peter Manfredonia, who was accused of killing two people in Derby and Willington and led law enforcement on a six day, multistate manhunt. See *State* v. *Manfredonia*, judicial district of Ansonia-Milford, Docket No. AAN-CR20-0117724-T ($5 million bond on charges of, inter alia, murder, felony murder, and home invasion); *State* v. *Manfredonia*, judicial district of Tolland, Docket No. TTD-CR20-0181886-T ($5 million bond on charges of, inter alia, murder and attempt to commit murder); *State* v. *Manfredonia*, judicial district of Tolland, Docket No. TTD-CR20-0181889-T ($2 million bond on charges of, inter alia, home invasion and first degree kidnapping); see also NBC Connecticut, "Fotis Dulos Released on Bond" (January 9, 2020), available at https://www.nbcconnecticut.com/news/local/fotis-dulos-michelle-troconis-and-local-attorney-due-in-court-for-murder-related-charges/2207265/ (last visited November 21, 2022).

[16] It is well settled that we ordinarily do not review claims raised for the first time at oral argument before this court, as such claims are—by definition—inadequately briefed and, therefore, not amenable to appellate review. See, e.g., *Burton* v. *Dept. of Environmental Protection*, 337 Conn. 781, 797 n.12, 256 A.3d 655 (2021). Particularly because the state has not objected to the defendant's belated raising of the 10 percent cash bail claim, we exercise our discretion to reach the merits.

[17] This constitutional language is "substantially the same" as that of nearly forty states, the constitutions of which date back to the nineteenth century. *State* v. *Johnson*, 61 N.J. 351, 354, 294 A.2d 245 (1972); see *State* v. *Menillo*, supra, 159 Conn. 271 (describing "a rather surprising uniformity in the wording of the constitutional provision in the various states").

[18] Similarly, the United States Supreme Court has stated, with respect to the excessive bail clause of the eighth amendment to the United States constitution, that, "[l]ike the ancient practice of securing the oaths of responsible persons to stand as sureties for the accused, the modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture serves as additional [en]surance of the presence of an accused. Bail set at

a figure higher than an amount reasonably calculated to fulfill this purpose is 'excessive' under the [e]ighth [a]mendment. . . . [Because] the function of bail is limited, the fixing of bail for any individual defendant must be based [on] standards relevant to the purpose of [en]suring the presence of that defendant." (Citation omitted.) *Stack* v. *Boyle*, 342 U.S. 1, 5, 72 S. Ct. 1, 96 L. Ed. 3 (1951).

[19] As in *State* v. *Anderson*, supra, 319 Conn. 291, the trial court in the present case set a bond for the defendant—albeit one that is extraordinarily high at $20 million. Having rejected the concept of a functional denial in *Anderson*, we leave to another day whether the state constitutional imperative that bail be "reasonable under all of the relevant circumstances"—which, under *Menillo*, need not be " 'an amount within the power of an accused to raise' "—means that there may well be circumstances under which a trial court may properly deny bond outright in a noncapital case without running afoul of our state constitution, rather than engaging in the form-over-substance exercise of conjuring an unaffordable bond number in an effort to hold a defendant in order to ensure his appearance at trial or to protect the safety of the community. Id., 308; see also *State* v. *Menillo*, supra, 159 Conn. 269.

We also note that neither party argues that the "capital offense" exception to the right to bail under article first, § 8, of the Connecticut constitution applies under the circumstances of the present case. We leave to another day whether the applicability of that exception is determined by the capital status of the crime when charged, as opposed to when the constitutional provision was enacted.

[20] At the hearing, defense counsel noted that the defendant's parents owned two houses in Massachusetts that had been purchased for $400,000 and $500,000, respectively. Judge Harmon was provided with no information regarding the current market value of the properties or whether they were mortgaged or otherwise encumbered.

[21] To the extent that any additional motions for modification of bond are filed pursuant to Practice Book §§ 38-14 and 38-17, this hearing may well be combined with one held in connection with any new motion for bond modification pursuant to §§ 38-14 and 38-17; see footnotes 7 and 11 of this opinion; at which time the trial court may consider whether to modify the $20 million bond amount in light of any evidence that the parties may introduce.

[22] In Massachusetts, these factors include "the nature and circumstances of the offense charged, the potential penalty the person faces, the person's family ties, financial resources and financial ability to give bail, employment record and history of mental illness, his [or her] reputation and the length of residence in the community, his [or her] record of convictions, if any, any illegal drug distribution or present drug dependency, any flight to avoid prosecution or fraudulent use of an alias or false identification, any failure to appear at any court proceeding to answer to an offense, whether the person is on bail pending adjudication of a prior charge, whether the acts alleged involve abuse . . . whether the person has any history of [abuse prevention] orders issued against him [or her] . . . whether he [or she] is on probation, parole, or other release pending completion of sentence for any conviction, and whether he [or she] is on release pending sentence or appeal for any conviction." (Internal quotation marks omitted.) *Walsh* v. *Commonwealth*, supra, 485 Mass. 584–85, quoting Mass. Gen. Laws ch. 276, § 58.

[23] We observe that the arraignment held upon transfer to the part A trial court docket could present a suitable opportunity to schedule this motion hearing in serious matters such as the present case.

[24] By contrast, the state has the burden when, with a good faith basis, it moves to increase a bond on the ground that it is "insufficient in amount or security or that the written promise of the defendant to appear is inadequate" to ensure the person's appearance or the safety of others. Practice Book § 38-14. The state must satisfy its burden to increase bond by a preponderance of the evidence.

[25] We focus in particular on issues relating to the affordability of the bond amount because that is the subject of the present appeal. We recognize, of course, that a party may seek modification of the bond on other grounds, as well. Although it is not possible to predict with certainty, we anticipate that the basic framework set forth herein will provide adequate guidance when a motion for bond modification involves an issue other than affordability.

[26] We note, for example, that, on this record, the prosecutor's representations about hearing from "law enforcement" about generalized financial transactions with China would likely not qualify as reliable hearsay at any potential modification hearing. Likewise, defense counsel made certain unsupported factual representations regarding the Massachusetts real estate belonging to the defendant's parents, as to which the trial court may have required documentation of some kind to substantiate.

[27] We note that much of the case law we reviewed in this area arises from states that, unlike Connecticut, have statutory schemes permitting preventive detention for community danger that are akin to the federal Bail Reform Act of 1984, 18 U.S.C. § 1341 et. seq., as upheld and explicated in *United States* v. *Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987), which informs some of the procedures required for the detention of a defendant. In Connecticut, a judge has no authority to detain someone without bond, but the safety of others is one factor the judge may consider in setting the amount of the bond. See General Statutes (Supp. 2022) § 54-64a (b) (1), as amended by P.A. 22-37, § 38.